Filed 2/26/26

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TODD A. FISHER, Individually and as Successor in Interest, etc., | D083806 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2021-00044389-CU-MC-CTL) |
| BRUCE B. FISHER et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment and order of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Affirmed.

Bruce B. Fisher, in pro. per., for Defendant and Appellant Bruce B. Fisher.

Sheppard, Mullin, Richter & Hampton and Todd E. Lundell for Defendant and Appellant Kent Fisher.

Williams Iagmin and Jon R. Williams for Plaintiff and Respondent.

This wrongful death case has its origin in a feud between four adult brothers over the division of their parents' estate. Decedent Wade Fisher and plaintiff Todd Fisher were on one side. Defendants Brittin Fisher and Kent

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of Discussion parts II and III.

Fisher were on the other. Wade, the youngest, was a recovering alcoholic who had been sober for 15 years. After their father died, Wade cared for their mother before she went into assisted living, then he moved to Hawaii to escape the family dysfunction.

Todd's wrongful death claims stem from a phone call Brittin and Kent made to the San Diego Police Department (SDPD) five months after their mother died. Todd alleged that Brittin and Kent falsely reported their mother missing, even though they knew she had died of natural causes, with the intent to cast suspicion on Todd and Wade. As a result, SDPD contacted Wade by telephone to inquire about their mother but quickly dropped the matter after learning she was dead. The phone call greatly upset Wade. A week later, he relapsed and drove his motorcycle drunk with marijuana in his system and without a helmet. He crashed and died. A psychologist testified that the phone call caused Wade's relapse.

Todd sued Brittin and Kent for wrongful death on behalf of himself and Wade's estate. A jury found Brittin and Kent liable for negligence and intentional infliction of emotional distress (IIED). The jury also found Brittin and Kent conspired to make false statements to SDPD requiring law enforcement intervention, and acted with malice, oppression, or fraud. On causation, the jury found their conduct was a substantial factor in causing severe emotional distress and harm to Wade. The jury awarded about $5.1 million to Wade's estate and $4.3 million to Todd, including $80,000 in punitive damages against each defendant.

On appeal, defendants do not contest any of the jury's liability findings, including on cause in fact. They contend, however, that their tortious conduct was not the *legal cause* of Wade's relapse and drunk driving death as a matter of law. In the published portion of this opinion, we reject this

2

contention and conclude that defendants' intentional infliction of emotional distress was a legal cause of Wade's death. Applying the broader standard of legal cause applicable to intentional torts, we find that Wade's death was within the scope of liability for wrongful death based on the IIED verdict. On this record, no public policy exists to restrict liability for an intentional tort which the jury found to have been a substantial factor in causing the severe emotional distress that resulted in Wade's relapse and subsequent death. In the unpublished portion of this opinion, we reject the defendant's remaining contentions. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We summarize the relevant facts in the light most favorable to the judgment.

A. *Dispute Over Parents' Assets and Estates*

Leonard and Gale Fisher had four sons, from oldest to youngest: Brittin, Todd, Kent, and Wade. In 2012, for tax reasons, Leonard and Gale asked their adult sons to discuss how to divide some properties among themselves while both parents were still living. The brothers could not agree on how to apportion their parents' assets, which began a protracted and acrimonious series of disputes between Todd and Wade on one side and Brittin and Kent on the other. One particularly contentious argument resulted in Brittin pushing Wade and biting Wade's face. Soon after that incident, Wade told his brothers he wanted nothing to do with the dispute over their parents' assets and he would refuse to take any money from their estates.

From that point onward, Todd and Wade maintained a close relationship with their parents, visiting them often and taking them to doctor appointments. Todd and Wade were also good friends with each other,

3

sharing hobbies and vacationing together. Kent and Brittin, however, had limited contact with their parents and very little direct communication with Todd and Wade.

Leonard died in June 2014 and his will dictated that the four brothers should draw straws to determine who would receive which of four asset "buckets" at his will's reading. Unfortunately, the drawing of straws did not resolve their conflicts. When Todd became the trustee of Leonard's trust, he terminated Kent's maintenance work on some of his father's properties. Kent and Brittin accused Todd of misappropriating Leonard's assets, including a boat and a family-owned business. Their disputes led to probate litigation.[1] According to Todd, the four brothers eventually inherited equal parts of $550,000 from Leonard's estate outside of the trust. According to Kent, however, Wade had not received any part of his inheritance from either Gale's or Leonard's estate before his death.

### B. Gale's Death

The conflict among the brothers also caused a rift to form between Gale on the one hand and Brittin and Kent on the other. In 2017, Gale decided to disinherit Brittin and Kent because she was upset they were litigating Leonard's trust and probate. She amended her trust to state that for purposes of any distribution under its provisions, Brittin and Kent "shall be considered to have predeceased [Gale] without issue." She simultaneously

---

[1] The probate court eventually modified certain provisions of Leonard's trust and ordered that each of the brothers receive some money from Leonard's estate. We affirmed the court's order on appeal. (See *Fisher v. Fisher* (Sept. 8, 2022, D078019) [nonpub. opn.].) The jury did not receive any evidence about this probate order or our prior opinion.

4

executed a will which disinherited Brittin and Kent by excluding them from the definition of "children."

In the meantime, Wade took care of Gale in the final years of her life and Todd visited her two or three times a week. A caretaker who worked for Gale from 2014 to 2019 testified that Gale lived in her Point Loma home from May to October during the year, and then in her home in Indian Wells the rest of the year. Wade lived with Gale at her Point Loma home and sometimes stayed with her in Indian Wells also. Gale's caretaker only saw Brittin once and Kent about four times between 2014 and 2019. Communications between Kent and Todd had also broken down by 2016, and the last time Kent saw Gale was in 2018. Because of their estrangement, Kent had very little sense of where Gale was or how she was doing after 2018.

In 2019, Gale moved into an assisted living facility near Phoenix and eventually needed memory care. According to Todd, her phone service was terminated in 2020 because she was no longer able to use her cell phone. Wade had moved to Hawaii by then "to get away from all the disputes."

Gale passed away in October 2020. When she died, Todd sent a three-word e-mail to his brothers and a small group of family friends stating: "Mom passed today." Brittin testified that when he saw Todd's e-mail, he "wasn't sure what was happening." But in the weeks that followed, Brittin e-mailed Gale's current and former probate attorneys noting that he had "received notification" that Gale had passed away. He also requested that the probate court proceed with probating Gale's estate, which he said he would not have done if he did not think Gale had died. At that time, it had been several years since Brittin had seen Gale.

*C. The March 2021 Phone Call*

In the evening of March 16, 2021, Todd received a frantic call from Wade saying that an officer with the SDPD had called him looking for Gale and inquiring about her whereabouts. Wade conferenced Todd into the call with the officer, who told them that he was outside Gale's former home in Point Loma because someone had reported her missing. Todd informed the officer that Gale had passed away months prior, and at the officer's request, Todd drove to the Point Loma house to show him Gale's death certificate. The officer told Todd that the reporting parties—who Todd soon realized were Brittin and Kent—said he and Wade lived at the Point Loma address with Gale. After receiving an electronic copy of the death certificate and a copy of the e-mail Todd sent his brothers announcing Gale's death, the responding officer did not investigate further, nor did he file a formal police report.

According to records from the original radio call, the dispatcher noted that according to two of Gale's sons, although Gale had purportedly died about a year or so prior, they were still unaware of her whereabouts despite contacting various agencies to look for her. This raised "a red flag" to the dispatcher, who then sent an officer to conduct an initial evaluation. The officer knew from the dispatch information that there was an ongoing dispute among the brothers over estate funds and that there had been an e-mail announcing Gale's death. Kent was documented as the reporting party and "Bruce"—presumably referring to Brittin—was listed as someone "assist[ing]" Kent. Kent or Brittin provided a physical description of Gale to the dispatcher and reported that Gale's phone had been turned off.

Later that same night, Brittin e-mailed his brothers, Gale's probate attorneys, Todd's attorney, and Kent's attorney. The e-mail requested, among other things, that someone "please reply with the date, location and

6

the surrounding circumstances of Gale's death." The message ended with: "Time and response may be of the essence."

*D. Wade's Sobriety, Relapse, and Death*

Before receiving the March 2021 phone call from SDPD, Wade had been sober for about 15 years after previously struggling with alcoholism. Brittin and Kent both knew Wade was an alcoholic. Wade was a member of Alcoholics Anonymous and made meetings a priority. His close friends described him as being "very disciplined" and they never saw him consume alcohol or marijuana, even though he frequently bought alcoholic drinks for others in social settings and lived in homes where alcohol was easily accessible. Wade was also "extremely cautious" about the risks of drunk driving and he was adamant that none of his friends should drink and drive, often serving as the designated driver. Todd and Wade's friends had no suspicion that Wade was drinking or trying to hide his drinking.

But the phone call from SDPD upset Wade and he was shocked that Kent and Brittin would "keep doing this kind of thing to him." Wade believed that the police report had been "made up to hurt him." Brittin's e-mail that same night also frustrated Wade further, and in the days that followed, Wade was "spinning," "flipping out," "replaying the events in his head," and trying to understand why his brothers would persist in wounding him. Wade asked Todd for a copy of Gale's estate planning documents, which surprised Todd given Wade's past desire to avoid anything related to his parents' estates. Wade also told his friends how distressed he was that his brothers would call the police to Gale's home.

Wade was living alone at a friend's house in Hawaii at the time. Wade's girlfriend, who lived in San Diego but spoke with Wade daily during the week after the phone call, said he seemed "overly stressed and kind of not

himself." He spoke often about the call but would then change the subject and try to "be positive."

The morning of March 23, 2021, a week after Wade got the phone call from SDPD, Wade's girlfriend said her communications with Wade were as usual. But later that day in the late afternoon or evening, Wade crashed his Vespa into a wall next to a straight roadway and died from his injuries. He was not wearing a helmet, had a blood alcohol level almost three times the legal limit, and had marijuana in his system. Wade's friends, including Todd, expressed surprise and shock that Wade would drive under the influence.

*E. Expert Testimony*

Dr. Martin Williams, a psychologist with experience in substance abuse disorders, opined that Kent and Brittin's phone call to the police is "precisely what caused Wade to relapse." Dr. Williams observed that Wade "had made all these efforts to maintain a peaceful life" and that the phone call "put him over the edge." He opined that the stress of being implicated in the death of his mother, whom he was very close to, was "beyond the kind of stress that people are able to handle as recovering alcoholics[.]" In Dr. Williams' view, there was nothing else in the documentation he reviewed—which included the complaint and cross-complaint, Gale's death certificate, Wade's death certificate, tributes from Wade's funeral, and background information regarding the disputes over Gale and Leonard's estates—that could have contributed to his relapse.

According to Dr. Williams, he would expect a person who had relapsed to commit crimes, "but specifically the crime of driving while intoxicated, absolutely." He opined it was foreseeable that someone who relapsed would drive drunk, and he was not surprised to learn Wade had marijuana in his system because "[i]f a person relapses in that fashion, all bets are off" and he

would not be surprised that a relapsing alcoholic consumed drugs. He also believed it would be foreseeable to anybody who knew Wade's drinking habits that if he relapsed, he would probably return to those same habits.

### F. Defendants' Testimony

Brittin and Kent both testified that they had reached out to various state and county agencies about Gale's death before calling SDPD because they needed a copy of her death certificate to take ownership of certain stock. According to Brittin, when he contacted the police earlier in the day on March 16, 2021, they told him Gale was listed as "not deceased" in their records and he got a similar response when he contacted a social security agency representative. That evening, Brittin initiated the 30-minute call to SDPD and Kent was only conferenced into the call for the last ten minutes. Brittin testified that neither he nor Kent told the police Gale was missing during that phone call, although Kent was "not positive" at that time that Gale had actually died.

Brittin and Kent both testified that they merely answered the dispatcher's questions and did not intend to harm Wade or Todd. When asked whether he talked to the police because he was concerned about elder abuse toward Gale, Kent said he had already relayed some concerns about elder abuse to his lawyer during the dispute over Leonard's estate. He added that he had "always been concerned about [Gale's] well-being" and prayed for her every day although he had not spoken to her during the last two years of her life.

### G. Damages Evidence

The jury heard testimony and received documentary evidence regarding the terms of Leonard's and Gale's respective trusts. It also received an inventory of Gale's trust assets as of October 2021 and an

9

accounting of Leonard's 2014 trust assets through October 2023, purportedly to show what Wade would have received from both trusts if he had lived. Todd testified that because Wade had died, he would not share in the roughly $8.7 million of assets from Gale's trust. Gale's and Leonard's trust documents both identified as beneficiaries their lawful issue "living at the time of the proposed distribution."

Todd presented evidence showing the costs he incurred for the mortuary bill and plane tickets to and from Hawaii to make arrangements after Wade's death. He also testified regarding his close companionship with Wade.

*H. Trial Proceedings*

Todd, individually and as Wade's successor in interest, filed a complaint against defendants in October 2021 alleging causes of action for defamation, IIED, negligence per se, and wrongful death under Code of Civil Procedure section 377.60. The complaint alleged that defendants' actions "were the legal cause of Wade's tragic and untimely death" and that they "concocted a plan to use the police to harass, intimidate, upset, and ultimately disrupt their brothers' lives." The complaint also alleged that defendants "knew or reasonably should have known that their planned conduct was likely to cause Wade to relapse and begin abusing alcohol again."[2]

Todd withdrew his defamation and negligence per se claims before trial and proceeded on IIED, negligence, and wrongful death causes of action.

---

[2]     Todd's counsel confirmed throughout the proceedings that he was only asserting a wrongful death claim and not a survival claim. A wrongful death claim (Code Civ. Proc., §§ 377.60–377.62) is brought on behalf of the heirs, not the decedent. (*Adams v. Superior Court* (2011) 196 Cal.App.4th 71, 76–78.) The elements of a wrongful death claim are a wrongful act or neglect,

10

During the jury trial, the court granted his request to amend his complaint to conform to proof and add a conspiracy claim against defendants.[3]

The court instructed the jury before closing arguments. Among other things, the court instructed the jury on the essential elements of the IIED claim using CACI No. 1600. That instruction provided that to prevail in his IIED claim, Todd had to prove in relevant part that: (1) defendants' conduct was outrageous; (2) they intended to cause plaintiffs emotional distress or acted with reckless disregard of the probability that plaintiffs would suffer emotional distress; (3) plaintiffs suffered severe emotional distress; and (4) defendants' conduct was a substantial factor in causing plaintiffs severe emotional distress.

The court also instructed the jury on CACI No. 430 (Causation: Substantial Factor), which states that "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm."

Using a special verdict form agreed to by the parties, the jury found as to the IIED claim that defendants' conduct was outrageous and that they

---

resulting in death, and damages consisting of loss suffered by the heirs. (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968.) Though pled as separate claims, the negligence and IIED claims also supplied the wrongful acts required for the wrongful death claim. Because the issues have not been raised on appeal, we express no view on the propriety of asserting these claims separately or bringing wrongful death claims both on behalf of Todd individually and as successor in interest to Wade.

[3] "Conspiracy is not a separate tort, but a form of vicarious liability by which one defendant can be held liable for the acts of another." (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 652.) The trial court here instructed on conspiracy to commit intentional infliction of emotional distress or negligence.

each intended to cause Wade and/or Todd emotional distress. The jury further found that Wade, but not Todd, suffered severe emotional distress, and that defendants' conduct was a substantial factor in causing Wade's severe emotional distress.

On the negligence claim, the jury found that Brittin, Kent, and Wade were each negligent, and that their negligence was a substantial factor in causing harm to Wade. The jury assigned percentages of responsibility to each party whose negligence caused harm to Wade as follows: 20 percent to Brittin, 20 percent to Kent, and 60 percent to Wade.

On conspiracy, the jury found that defendants conspired to make false statements to SDPD that required law enforcement intervention.

As for damages, the jury was not asked to differentiate between the individual claims. For the "lost value of all inheritance Wade . . . would have received if he had been alive" when Leonard's and Gale's trust assets "are distributed," the jury awarded Wade's estate $1 million award for lost inheritance from Leonard's trust and $4 million for lost inheritance from Gale's trust.[4] The jury awarded Todd $5,000 in economic damages for the cost of Wade's funeral and related expenses. The jury also awarded Todd $500,000 in noneconomic damages for past suffering, anguish, and other emotional distress, along with $3.8 million for the loss of Wade's companionship. The jury found that defendants acted with malice, oppression, or fraud, and in a separate special verdict form, the jury awarded Todd as Wade's successor in interest $80,000 against Brittin and $80,000

---

[4]     On appeal, defendants do not dispute that lost inheritance damages are recoverable in a wrongful death action. We therefore have no occasion to decide the issue.

12

against Kent in punitive damages. The court entered judgment on the jury's verdict and awarded costs of the suit to Todd.[5]

### I. *Motions for JNOV and New Trial*

Defendants moved for JNOV under Code of Civil Procedure section 629, asserting that the verdicts were not supported by any substantial evidence and the award of damages was "speculative and excessive." Specifically, they argued their actions were insufficiently "substantial or enduring" to sustain a verdict for IIED, that the amount of Wade's inheritance had not been established at trial and was "presently unknown," and that their call to the police was a privileged communication under Civil Code section 47.

Defendants also moved for a new trial under Code of Civil Procedure section 657 on the grounds that the court had wrongfully curtailed their cross-examination of Todd and engaged in "repeated beratement and perceived prejudice against defendants, in the presence of the jury." Defendants further argued their conduct could not sustain a verdict for IIED and that the awarded damages were "excessive and speculative" for the same reasons cited in their motion for JNOV. They also contended that Todd's counsel committed misconduct during closing argument.

The trial court denied the motions for JNOV and a new trial on all grounds. In denying JNOV, the court explained: "The jury was well within its rights to conclude that [defendants] told the SDPD they did not know what had happened to their mother; that they did not know when or where she had died; and that they believed their brothers (Todd and/or Wade) were

---

[5] Although the jury apportioned fault for the negligence claim, principles of comparative fault do not apply to reduce an intentional tortfeasor's liability based on the acts of others. (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 24.) Because the jury found defendants liable for IIED, the final judgment did not apportion the damages based on the jury's comparative fault findings.

somehow complicit in her disappearance and passing. All of this was completely untrue, and both defendants knew it. . . . The jury had every right to conclude that the real purpose of the call was not to gain information, but to cause problems for Wade and Todd in an effort to seek leverage in the parties' probate battles. This, coupled with defendants' awareness of Wade's struggle with alcoholism and his retreat to Hawaii to avoid their campaign to control the estates of their late parents, arguably constituted extreme and outrageous conduct. . . . [¶] . . . [¶] The jury was entitled to believe that the call to SDPD was for the purpose of manipulating the fight over money and property earned, accumulated and saved by the parties' parents. Sadly, avarice overcame fraternal piety." In denying the motion for new trial, the court incorporated this discussion and determined that the evidence supported the verdict "acting as the 'thirteenth juror' and independently weighing the evidence."

The trial court also rejected defendants' argument that "Wade was the 'unforeseeable plaintiff' like poor, unlucky Helen in *Palsgraf v. Long Island Railroad* (1928) 248 NY 339." The court explained: "This argument fails for three interrelated reasons: defendants were well aware of Wade's struggles with alcoholism; they knew of his retreat to Hawaii to escape his perception they were misusing the probate litigation; and they knew their call to SDPD on false pretenses would come to Wade's attention."

DISCUSSION

I

We begin by addressing defendants' contention that the judgment must be reversed because their conduct was not the proximate cause of Wade's death as a matter of law. As noted, defendants do not challenge any of the jury's liability findings, including that they engaged in outrageous conduct

14

intended to cause emotional distress and that their tortious conduct was a substantial factor in causing harm to Wade. Instead, they argue that their conduct was not the *legal cause* of Wade's death as a matter of law because his death was not within the scope of their liability for negligence or IIED. We conclude that Wade's drunk driving death was within the scope of liability for wrongful death based on the IIED verdict. We therefore need not consider whether Wade's death was also within the more narrow scope of liability for the negligence claim.

*A. General Legal Principles*

Proximate cause involves two elements. (*Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1045.) The first is cause in fact. A cause in fact is a necessary antecedent of an event. (*Ibid.*) "This is sometimes referred to as 'but-for' causation." (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352 (*State Hospitals*).) Where concurrent independent causes contribute to an injury, courts apply a substantial factor test for determining cause in fact. (*Id.* at p. 352, fn. 12.) The substantial factor test subsumes traditional "but for" causation. (*Ibid.*)

The second element of proximate cause—sometimes referred to as "legal cause"—focuses on public policy considerations. (*State Hospitals, supra*, 61 Cal.4th at p. 353.) Because the purported factual causes of an event may be traced back to the dawn of humanity, the law has imposed additional limitations on liability other than simple causality. (*Ibid.*) "These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy." (*PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 315–316.) "Both Witkin and the Restatement of Torts frame this aspect of proximate

15

cause as 'scope of liability.' " (*Modisette v. Apple, Inc.* (2018) 30 Cal.App.5th 136, 154 (*Modisette*).) We will use the same terminology.

Proximate cause is ordinarily a question of fact which cannot be decided as a matter of law. (*State Hospitals, supra*, 61 Cal.4th at p. 353.) It may nevertheless be resolved as a question of law if the facts are such that the only reasonable conclusion is an absence of causation. (*Ibid.*)

The parties agree that the scope of liability element of proximate cause presents an issue of law subject to de novo review because it is primarily concerned with public policy. (See *Modisette, supra*, 30 Cal.App.5th at p. 154 ["The extent or scope of a defendant's liability is a question of law"].) We will therefore decide the issue de novo.[6] In doing so, we review the factual record in the light most favorable to the judgment and accept the jury's unchallenged factual findings.

### 1. The Restatement

California courts generally follow the Restatement in analyzing proximate cause and scope of liability. (See, e.g., *State Hospitals, supra*, 61 Cal.4th at p. 352, fn. 12; *Shih v. Starbucks Corp.* (2020) 53 Cal.App.5th 1063, 1068 (*Shih*).) For scope of liability questions, there are three different

---

[6] We note, however, that the Restatement of Torts treats this as an issue of fact on which the jury should be instructed, just like cause in fact. (See Rest.3d Torts: Liability for Physical and Emotional Harm (Restatement or Rest.), § 29, com. b, p. 494 [stating that when scope of liability is a genuine issue, the jury should receive separate instructions on both factual cause and scope of liability]; *id.*, at com. q, p. 511 ["the court's role is to instruct the jury on the standard for scope of liability when reasonable minds can differ . . . and it is the function of the jury to determine whether the harm is within the defendant's scope of liability"].)

16

Restatement provisions of potential relevance here: sections 29, 33, and 46, which we discuss below.

Restatement section 29 (entitled "Limitations on Liability for Tortious Conduct") states that "[a]n actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious." California courts have applied this scope of risk standard in determining scope of liability for cases involving negligence or products liability. Under this standard, "[a] number of courts have found, as a matter of law, that a defendant is not liable for an injury only distantly connected to defendant's conduct." (*Novak v. Continental Tire North America* (2018) 22 Cal.App.5th 189, 198 [connection between defendants' conduct and accident was too attenuated to be within scope of risk]; see also *Shih,* 53 Cal.App.5th at p. 1069 [alleged defect in Starbucks cup was not a legal cause of burns plaintiff sustained applying scope of risk standard].)

Restatement section 29 is the appropriate scope of liability standard for plaintiffs' negligence claim. But the jury also found in their favor on the IIED claim, and it was not asked to segregate the damages as between the claims. We must therefore consider what the appropriate scope of liability standard is for such an intentional tort.

Restatement section 33 (entitled "Scope of Liability for Intentional and Reckless Tortfeasors") sets forth a different scope of liability standard for intentional torts. It states:

> "(a) An actor who intentionally causes harm is subject to liability for that harm even if it was unlikely to occur.
>
> "(b) An actor who intentionally or recklessly causes harm is subject to liability for a broader range of harms than the harms for which that actor would be liable if only acting negligently. In general, the important factors in determining the scope of liability are the moral culpability

17

of the actor, as reflected in the reasons for and intent in committing the tortious acts, the seriousness of harm intended and threatened by those acts, and the degree to which the actor's conduct deviated from appropriate care.

"(c) Notwithstanding Subsections (a) and (b), an actor who intentionally or recklessly causes harm is not subject to liability for harm the risk of which was not increased by the actor's intentional or reckless conduct."

Comments (a) and (e) to Restatement section 33 confirm that the scope of liability for intentional and reckless tortfeasors is broader than the Restatement section 29 risk standard that applies to negligent tortfeasors. Comment (a) explains: "*The inadequacy of the risk standard.* The risk standard provided in § 29 is inadequate to provide appropriate limits on the scope of liability for intentional and reckless tortfeasors. . . . To the extent that scope of liability is employed to prevent a defendant's liability from being out of proportion with the tortfeasor's culpability, the scope of liability for intentional and reckless tortfeasors should be broader than for negligent or strictly liable tortfeasors." Comment (e) states: "*Expanded scope of liability for unintended harms.* Subsection (b) states the general proposition that the scope of liability for intentional and reckless tortfeasors for unintended harms is broader than the risk standard provided in § 29."

Restatement sections 29 and 33 fall within a chapter specifically governing scope of liability. (Rest., ch. 6.) A different chapter (Rest., ch. 8) contains additional provisions for "stand-alone emotional harm" not caused by any physical harm. (See Rest., ch. 8, Scope Note.) In this context, the term "stand-alone" emotional harm "includes instances when both physical and emotional harm occur but the emotional harm does not result from physical harm." (*Ibid.*) "What constitutes factual cause and scope of liability are governed by Chapters 5 and 6, respectively," whereas chapter 8

18

"addresses further limits on and rules about liability in cases involving emotional harm not caused by physical harm." (*Ibid.*)

Restatement section 46 (entitled "Intentional (or Reckless) Infliction of Emotional Harm") is one of the chapter 8 provisions. It provides that "[a]n actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm." Comment (g) to this section observes that "[t]he intentional-infliction tort (unlike other intentional torts, which address specific types of conduct or protect narrow interests) covers a wide range of behavior that is bounded only by the 'extreme and outrageous' limitation."

2. California Case Law on Scope of Liability for Intentional Torts

Like the Restatement, California courts have recognized that scope of liability is broader for intentional torts than for negligence. (See, e.g., *Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1036 (*Brewer*) [" 'The modern tendency is to impose broader liability for consequences where the defendant was guilty of an intentional wrong than where his conduct was merely negligent.' "]; *Helm v. K.O.G. Alarm Co.* (1992) 4 Cal.App.4th 194, 202 (*Helm*) ["the definition of 'cause' in cases involving intentional torts appears much broader"]; *Tate v. Canonica* (1960) 180 Cal.App.2d 898, 904 (*Tate*) ["The law has for a long time recognized a distinction between intentional and negligent torts . . . and been more inclined to find that defendant's conduct was the legal cause of the harm complained of, where the tort is intentional."].)

The California Supreme Court has explained that the defendant's moral blame is an important factor behind this distinction. (See *Thing v. La Chusa* (1989) 48 Cal.3d 644, 652–653 (*Thing*) [" 'the increased liability imposed on an intentional wrongdoer appears to reflect the psychological fact

19

that solicitude for the interests of the actor weighs less in the balance as his moral guilt increases and the social utility of his conduct diminishes' "].)

Regarding IIED specifically, "California cases have been in accord with [earlier versions of the Restatement] in allowing recovery where physical injury resulted from intentionally subjecting the plaintiff to serious mental distress." (*State Rubbish Collectors Asso. v. Siliznoff* (1952) 38 Cal.2d 330, 337 (*State Rubbish*), citing *Emden v. Vitz* (1948) 88 Cal.App.2d 313, 315–319 [intentional infliction of emotional distress resulting in upset to glandular condition, causing shortness of breath, heart pain, nervousness, headaches, loss of sleep, and inability to carry on normal activities]; *Bowden v. Spiegel, Inc.* (1950) 96 Cal.App.2d 793, 794–795 [intentional infliction of emotional distress causing plaintiff to be "sick and ill" for an "indefinite time"]; *Richardson v. Pridmore* (1950) 97 Cal.App.2d 124, 128–130 [intentional infliction of severe mental stress and physical strain resulting in miscarriage].)

In *State Rubbish*, our Supreme Court described provisions of the first Restatement of Torts as follows: "A defendant who intentionally subjected another to mental distress without intending to cause bodily harm would nevertheless be liable for resulting bodily harm if he should have foreseen that the mental distress might cause such harm." (*State Rubbish, supra*, 38 Cal.2d at pp. 336–337.) A few paragraphs later, however, the Supreme Court quoted a 1947 amendment to the first Restatement which stated the rule without any reference to foreseeability: " 'One who, without a privilege to do so, intentionally causes severe emotional distress to another is liable (a) for such emotional distress, and (b) for bodily harm resulting from it.' " (*Id.* at p. 337.) The court made these observations only in deciding that a tort

20

plaintiff may recover for mental suffering without any accompanying physical injury.  (*Id*. at p. 338.)

In *Tate, supra*, 180 Cal.App.2d 898, the court relied on this line of cases in deciding the scope of liability for IIED resulting in a suicide.  (*Id*. at pp. 904–913.)  The wrongful death complaint there alleged that the defendants made threats, statements, and accusations against the decedent for the purpose of harassing, embarrassing, and humiliating him.  As a result, the decedent became physically and mentally disturbed and took his own life.  The complaint in *Tate* did not allege, however, that the defendants acted for the purpose of causing the decedent to commit suicide.  (*Id*. at p. 900.)

The Court of Appeal nevertheless held that the plaintiffs could state a wrongful death claim for intentional injury causing the suicide.  (*Tate, supra*, 180 Cal.App.2d at pp. 904–913.)  Recognizing a broader scope of liability for intentional torts (*id*. at pp. 904, 906–907) and applying provisions of the first Restatement of Torts (*id*. at pp. 904–909), the court concluded that the defendants could be held liable for wrongful death "if (a) they intentionally caused severe physical or mental distress to decedent, and (b) that physical or mental distress was severe enough to be, in the judgment of the trier of fact, a substantial factor in bringing about the suicide."  (*Id*. at p. 912.)  The court stated: "We can see no good reason of policy that would relieve the defendants of liability [for IIED], if the suicide can be shown to have been in fact caused by the type of injury that the defendants intended to inflict [citation], merely because the decedent 'knew what he was doing' when he killed himself."  (*Id*. at p. 908.)  "[I]n a case where the defendant intended, by his conduct, to cause serious mental distress or serious physical suffering, and does so, and such mental distress is shown by the evidence to be 'a substantial factor in

21

bringing about' [citation] the suicide, a cause of action for wrongful death results . . . ." (*Id*. at p. 909.)

The court also ruled that foreseeability of the suicide was not a factor in determining scope of liability for IIED. (*Tate, supra*, 180 Cal.App.2d at p. 908.) The court explained that "this element—foreseeability of the particular injury—is a false quantity where the defendant intended to injure by causing serious mental distress." (*Id*. at p. 910.)

The *Tate* court rejected the defendants' argument that suicide is always an independent intervening cause breaking the chain of legal causation. (*Tate, supra*, 180 Cal.App.2d at pp. 901–903.) The court concluded "that the notion of independent intervening cause has no place in the law of intentional torts, so long as there is a *factual* chain of causation." (*Id*. at p. 907.)

In reaching this result, *Tate* relied heavily on the fact that suicide is not a crime in California. (*Tate, supra*, 180 Cal.App.2d at pp. 901–903, 913.) But this is not necessarily dispositive under current law. "The common law rule that an intervening criminal act is, by its very nature, a superseding cause has lost its universal application and its dogmatic rigidity. Like the doctrine of contributory negligence, intervening criminal action is no longer a total bar to recovery. Rather it is one consideration among many." (*Kane v. Hartford Accident & Indemnity Co.* (1979) 98 Cal.App.3d 350, 360.)

B. *Analysis*

With this background, we now turn to defendants' argument that their tortious conduct was not a legal cause of Wade's death as a matter of law. Defendants first argue that the policy considerations behind California's social host law (Civ. Code, § 1714, subd. (c)) preclude a finding of legal cause. This statute provides that, with certain exceptions, "no social host who furnishes alcoholic beverages to any person may be held legally accountable

22

for damages suffered by that person, or for injury to the person or property of, or death of, any third person, resulting from the consumption of those beverages." (*Ibid.*)

The Legislature enacted this provision "in order to create a broad statutory immunity against civil liability for social hosts who furnish alcoholic beverages to any person." (*Bass v. Pratt* (1986) 177 Cal.App.3d 129, 132.) In doing so, the Legislature declared that its intent was to "abrogate the holdings" of three identified California Supreme Court cases "and to reinstate the prior judicial interpretation of this section as it relates to proximate cause for injuries incurred as a result of furnishing alcoholic beverages to an intoxicated person, namely that the furnishing of alcoholic beverages is not the proximate cause of injuries resulting from intoxication, but rather the consumption of alcoholic beverages is the proximate cause of injuries inflicted upon another by an intoxicated person." (Civ. Code, § 1714, subd. (b).)

Defendants read into this statute a sweeping legislative policy that the consumption of alcoholic beverages is always the sole proximate cause of any injuries resulting from intoxication. This overreads the legislative intent. By its terms, the statute applies only to a "social host who furnishes alcoholic beverages" (Civ. Code, § 1714, subd. (c)), and its stated intent was merely to overrule prior caselaw "as it relate[d] to proximate cause for injuries incurred *as a result of furnishing beverages to an intoxicated person . . . .*" (*Id.*, subd. (b), italics added.) The statute was not intended to say anything about proximate cause for alcohol-related injuries incurred as a result of other forms of wrongdoing. (See, e.g., *Williams v. Saga Enterprises, Inc.* (1990) 225 Cal.App.3d 142, 148–150 [Civ. Code, § 1714 did not bar claim by victim of drunk driving accident against restaurant for breach of voluntary

23

undertaking not to return car keys to regular patron if he was under the influence].) The statute does not reflect any policy limiting the scope of liability for injuries incurred as a result of tortious conduct having nothing to do with the furnishing of alcohol. We therefore conclude that this statute does not supply a policy reason for limiting scope of liability here.

Defendants next argue that Wade's death was too attenuated from their phone call to the police to hold them responsible because it was not within the scope of the risks that made their conduct tortious under Restatement section 29. As we have explained, however, this scope of risk standard is not the proper measure of legal cause for intentional torts, such as plaintiffs' claim for IIED. Although it would be the appropriate standard for the negligence claim, liability for an intentional tort extends more broadly. (*Tate, supra*, 180 Cal.App.2d at pp. 904, 906–907.) In response to our request for supplemental briefing on this issue, the parties now agree that Restatement sections 33 and 46 both apply to the IIED claim. We therefore analyze the issue under these provisions.

Under Restatement section 33, the important factors for determining scope of liability for an intentional tort are the moral culpability of the defendants, as reflected in the reasons for and intent in committing the tortious acts, the seriousness of harm intended and threatened by their acts, and the degree to which their conduct deviated from appropriate care. (Rest., § 33(b).) Because legal cause is ultimately a policy question, we also consider any other policy reasons for or against limiting the scope of liability. We address each of these factors in turn.

As for the reasons for and intent in committing the tortious acts, the jury found that defendants intended to and did cause emotional distress to Wade. There is substantial evidence that defendants knew Wade was a

24

recovering alcoholic who had moved to Hawaii to find peace and escape from the family dysfunction because it took such a heavy toll on him. The jury further concluded the defendants conspired to make a false report to the police that required law enforcement intervention, which the jury could reasonably infer was intended to prompt an investigation of Wade for elder abuse of his own deceased mother. The jury also found defendants' conduct was outrageous, which the jury instructions defined to mean "beyond all possible bounds of decency" and "intolerable in a civilized community." This extraordinarily high standard of misconduct "describes a very small slice of human behavior." (Rest., § 46, com. a, p. 136.) And the jury also found that defendants acted with malice, oppression, or fraud warranting punitive damages. None of these jury findings is contested in this appeal.

Such intentional, outrageous, and malicious conduct has high moral culpability and no social utility that would weigh in favor of limiting the scope of liability for the harm it was a substantial factor in causing. (See *Thing, supra*, 48 Cal.3d at pp. 652–653 [recognizing that increased liability is imposed on intentional wrongdoer because " 'the interests of the actor weighs less in the balance as his moral guilt increases and the social utility of his conduct diminishes' "].) Although the jury made no specific finding regarding the underlying reasons why the defendants committed this conduct, it must have rejected the credibility of their explanation that they were merely trying to obtain a copy of Gale's death certificate.

As found by the jury, this conduct also deviates substantially from appropriate care. (Rest., § 33(b).) By definition, conduct that is "beyond all possible bounds of decency" and "intolerable in a civilized community" constitutes an extreme departure from appropriate care.

25

The harm intended and threatened by the defendants' conduct was serious as well. (Rest., § 33(b).) Again, the jury found that defendants conspired to make a false police report and intended to cause emotional distress to Wade. Subjecting someone to an unfounded law enforcement inquiry over the "disappearance" of their own deceased mother threatens serious harm. Although there was no evidence defendants intended to cause Wade to relapse and drive drunk, they knew he was a recovering alcoholic, which made a relapse and resulting harm more likely, including potentially self-destructive behavior. Viewing the evidence in the light most favorable to the judgment and the jury's uncontested findings, the intended and threatened harm were both serious.

Finally, we discern no other policy reason to insulate defendants from liability for the harm their intentional conduct factually caused. Over the years, tort law has evolved steadily towards greater protection of mental and emotional health. (See, e.g., *Downey v. City of Riverside* (2024) 16 Cal.5th 539, 547–548 [tracing development of tort law in recognizing freedom from emotional distress as an interest worthy of protection in its own right].) In recent years, we have also gained a greater appreciation of the severe emotional harm that can be caused by serious forms of bullying. Aside from the social host statute, defendants identify no public policy that would support cutting off liability for the harm factually caused by their intentional infliction of emotional distress. We can identify none either. (Cf. *Tate, supra,* 180 Cal.App.2d at p. 908 [finding "no good reason of policy" that would relieve defendants of liability for suicide committed by IIED victim].)

Accordingly, applying the Restatement section 33 analysis of moral culpability, as reflected in the reasons for and intent in committing the tortious acts, the seriousness of harm intended and threatened, and the

degree to which the conduct deviated from appropriate care, and factoring in other considerations of public policy, we conclude that Wade's relapse and death were within the scope of liability for wrongful death based on the IIED claim.

We reach the same result applying Restatement section 46 for intentional or reckless infliction of emotional harm and resulting bodily harm. The jury here found that the defendants intentionally caused Wade to suffer emotional distress and necessarily must have concluded that this severe emotional distress caused Wade's relapse and subsequent drunk driving death. Wade's relapse and death were both forms of bodily harm within the meaning of the Restatement. (See Rest., § 4 [defining "bodily harm" to include "disease" and "death"]; *In re Billings* (1990) 50 Cal.3d 358, 367 [recognizing alcoholism as a disease]; *Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1114 [same].)

Under Restatement section 46, defendants may be held liable for the emotional harm they intentionally inflicted against Wade and any bodily harm factually caused by this emotional harm. (Rest., § 46.) Just as the defendants in *Tate* could be held liable if their intentional infliction of emotional distress was a substantial factor in causing the decedent's suicide (*Tate, supra*, 180 Cal.App.2d at pp. 908–912), the defendants' conduct here satisfies the requirements of section 46 because their intentional infliction of emotional distress was a substantial factor in causing Wade's relapse and resulting death. Defendants concede that the record supports the jury's finding on the cause-in-fact question.

We also find it significant that the defendants knew Wade was a recovering alcoholic. Even in cases involving only negligent conduct, where the victim has a preexisting physical or mental condition that makes him

27

unusually susceptible and results in harm greater than might reasonably be expected, the actor is nevertheless liable for all such harm. (Rest., § 31.) This so-called "eggshell plaintiff" rule applies equally to claims for intentional infliction of emotional distress. (Rest., § 46, com. j, p. 145.) Indeed, " '[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is particularly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.' " (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1008, quoting Rest.2d Torts, § 46, com. f.) In *Crouch*, the court applied this rule in affirming a judgment against a nonprofit religious corporation for IIED committed by its director that resulted in the plaintiff's drinking and drug use, multiple pregnancies and abortions, self-harm, and a suicide attempt. (*Id*. at pp. 1001–1002.) The court here also instructed the jury on this eggshell plaintiff rule. (CACI No. 3928 [Unusually Susceptible Plaintiff].) The jury could reasonably have concluded that Wade's known alcoholism was a preexisting condition that made him unusually susceptible to harm from emotional distress. Accordingly, Wade's relapse and death were within the scope of defendants' liability for IIED under *Tate* and the Restatement.

We reject defendants' remaining arguments to the contrary. First, defendants repeatedly emphasize that Wade's death occurred "an ocean away" from their phone call to the police and "a week later." This argument misunderstands the meaning of "proximate" cause. Proximity in space or time is not the test. (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1050.) "An actor's tortious conduct need not be close in space or time to the plaintiff's harm to be a proximate cause." (Rest., § 29, com. b, p. 494.)

28

Second, defendants rely on Restatement section 33(c), which states that "an actor who intentionally or recklessly causes harm is not subject to liability for harm the risk of which was not increased by the actor's intentional or reckless conduct." Asserting that this provision "is only subtly different from the 'scope of risk' standard in section 29," defendants claim their conduct did not increase the risk of Wade's relapse, drunk driving, and death. As we have explained, however, Restatement section 33 and its comments make abundantly clear that this standard is materially broader than the section 29 risk standard and was specifically designed to provide expanded scope of liability for intentional torts resulting in unintended harms. (Rest., § 33(b), coms. a & e, pp. 562–563, 564; see also *Helm*, *supra*, 4 Cal.App.4th at p. 202 [causation standard for intentional torts is "much broader"].)

Moreover, the sole illustration provided for Restatement section 33(c) confirms its inapplicability here. Illustration 3 states as follows: "After leaving a shopping mall one night, Joe was confronted by Alex and Rob, two young hoodlums who approached Joe with threatening gestures and words, and who were carrying martial-arts weapons. Joe began to run from Alex and Rob, but was struck by lightning, causing Joe serious burns. Alex and Rob, despite their assault on Joe, are not liable for his harm because their assault, while a factual cause of Joe's burns, did not increase the risk of being struck by lightning and suffering burns." Wade's emotional distress and resulting relapse and drunk driving death were not comparable to being struck by lightning while fleeing an assault.

Finally, defendants contend that Wade's intervening conduct in driving drunk and not wearing a helmet should cut off their liability as a matter of policy. In our view, this amounts to an argument that either Wade's

29

contributory negligence should bar any recovery for his own death or his drunk driving should be treated as a superseding cause.  Our Supreme Court long ago abrogated the doctrine of contributory negligence in California (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 828–829), and even before that, it was not applicable to intentional torts (*Bartosh v. Banning* (1967) 251 Cal.App.2d 378, 385; *Tate, supra*, 180 Cal.App.2d at pp. 907–908).

As for superseding cause, this is an affirmative defense that, if applicable, should have been presented to the jury as a question of fact.[7] (*Landeros v. Flood* (1976) 17 Cal.3d 399, 411 [foreseeability of intervening act is ordinarily a factual question for trier of fact in deciding superseding cause defense].)  Indeed, defendants requested a modified version of CACI No. 432 on superseding cause as an affirmative defense based on Wade's drunk driving, and they also argued superseding cause as a defense in their motion for nonsuit at the close of plaintiffs' case.  The trial court refused their

---

[7] A superseding cause is typically an intervening act committed by a third party.  (See CACI Nos. 432, 433.)  In at least one case, however, our Supreme Court has used the term in reference to the plaintiff's own conduct. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1016–1017 [plaintiff's decision to practice shallow-water dive was not a superseding cause as a matter of law]; but see Rest., § 34, com. c, p. 571 ["employing superseding cause to bar a plaintiff's recovery based on the plaintiff's conduct is difficult to reconcile with modern notions of comparative responsibility" and "in most cases it constitutes . . . returning to a regime of contributory negligence as a complete bar to recovery"].)  There is also "a question as to whether the intervening and superseding act doctrine is applicable to intentional torts." (*Ash v. North American Title Co.* (2014) 223 Cal.App.4th 1258, 1276; see *Tate, supra*, 180 Cal.App.2d at p. 907 ["the notion of independent intervening cause has no place in the law of intentional torts, so long as there is a *factual* chain of causation"]; but see *Brewer, supra*, 40 Cal.App.4th at p. 1036 ["the doctrine of superseding cause is less likely to cut off the chain of events put in motion" by one who commits an intentional tort].)  We do not decide these issues because the superseding cause defense has not been raised on appeal.

requested instruction as argumentative and defendants have not challenged this ruling or argued superseding cause on appeal. Their superseding cause defense has therefore been abandoned. We decline to resurrect this abandoned defense in the form of a policy limitation on the scope of liability.

In sum, we conclude that Wade's relapse and death were within the scope of defendants' liability for wrongful death based on the IIED claim. We therefore need not consider whether Wade's death was within the scope of liability for the negligence claim. (See *Leyva v. Crockett & Co., Inc.* (2017) 7 Cal.App.5th 1105, 1108–1109 [judgment must be affirmed if it can be sustained on any theory of law applicable to the case]; see also *Crogan v. Metz* (1956) 47 Cal.2d 398, 403 [when plaintiff prevails on different theories of relief in the trial court, appellate court may affirm judgment on any theory supported by findings and evidence and may disregard other theories].)

## II

Defendants next contend that the court abused its discretion when it ended the defense's cross-examination of Todd prematurely, which warrants a new trial. We conclude that even assuming the court erred in that respect, defendants have failed to demonstrate prejudice.

A. *Additional Background*

The defense called Todd as a witness and cross-examined him under Evidence Code 776.[8] The court expressed frustration with defense counsel's line of questioning on a few occasions during the cross-examination. For example, the court instructed counsel to move on to a different topic after a series of questions regarding whether Todd issued a notification of trustee for Gale's trust. Later in the cross-examination, the court sustained a relevance objection for questions relating to the disposition of Gale's Point Loma house.

---

[8]    Undesignated statutory references are to the Evidence Code.

After an exchange in which defense counsel appeared to argue with Todd over whether he "caused [his] brothers' disinheritance," the court warned counsel that if he "argue[d] again before closing argument," the court was "going to end the examination."

After it sustained two more objections on section 352 grounds, the court followed through on its threat when defense counsel told Todd in front of the jury that "[t]he call of March 16th had to do with contact with law enforcement" and "had nothing to do with the estate planning." The court informed the defense, "That concludes your examination. I told you not to argue anymore, and that's what you just did. Thank you." When the court invited defense counsel "to follow-up" with questions for Todd after redirect, defense counsel said he would "pass."

In their motion for new trial, defendants asserted that the court had wrongfully curtailed their cross-examination of Todd. After the court issued a tentative ruling denying the motion and finding that defendants had failed to show prejudice from Todd's cross-examination being truncated, defendants submitted a written proffer without leave of the court. In the proffer, they asserted they had intended to impeach Todd with some of his deposition testimony and argue that Todd himself caused Wade's relapse by exaggerating the significance of the phone call. Defendants also asserted that they were unable to use Todd's cross-examination to introduce medical examiner, accident, and toxicology reports from Hawaii that established some of the circumstances of Wade's death. In its final order denying the motion for new trial, the court declined to consider defendants' proffer on the ground that it was an "unauthorized tardy reply essentially seeking to backfill the shortcomings of the moving papers identified in the tentative rulings."

32

B. *Analysis*

"Control of cross-examination is within the discretion of the trial court, and only a manifest abuse of discretion will warrant a reversal." (*People v. Stuller* (1970) 10 Cal.App.3d 582, 598.)  Even in criminal cases, the court "retains wide latitude to restrict repetitive, prejudicial, confusing, or marginally relevant cross-examination." (*People v. Sanchez* (2016) 63 Cal.4th 411, 450–451.)  " 'Claims of evidentiary error under California law are reviewed for prejudice applying the "miscarriage of justice" or "reasonably probable" harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, that is embodied in article VI, section 13 of the California Constitution. Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred.' " (*Mountain View Police Dept. v. Krepchin* (2024) 106 Cal.App.5th 480, 506 (*Mountain View*); see also *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 [*Watson* standard of prejudice applies to erroneous exclusion of only some defense evidence in a criminal case, as opposed to exclusion of all evidence of a defense].)

We conclude that even assuming any error, defendants have demonstrated no discernible prejudice from the curtailment of Todd's cross-examination.  Defendants claim that they were unable to meaningfully challenge Todd's credibility.  But before the trial court ended questioning, Kent's counsel had the opportunity to ask Todd about a wide range of topics including his e-mail announcing Gale's death, her death certificate, issues related to his parents' trusts, the family business, and Gale's relationship with defendants.  Kent's counsel also played clips of Todd's deposition for impeachment purposes.  The only specific subject matter defendants now argue they would have impeached Todd on is his testimony that Wade's

estate would not receive an inheritance from Leonard's trust because Wade did not survive the distribution, which they contend was contrary to an order issued by the probate court only weeks earlier. Yet defendants do not explain why they could not have introduced the probate court order through another witness or by way of a properly explained request for judicial notice.

In their belated offer of proof to the trial court, moreover, defendants did not even mention this subject, which undercuts their current assertion that they were intending to impeach Todd on it. Furthermore, Todd's testimony on this point was supported by language in Gale's and Leonard's trust documents which identified as beneficiaries their lawful issue "living at the time of the proposed distribution." Defendants have not challenged on appeal that the trusts require that beneficiaries survive the distribution of assets, nor did defendants dispute that assumption in the trial court.[9] Kent himself also testified that neither he nor Wade's estate had actually received any part of their inheritance from Leonard's estate at the time of trial because despite the probate court's order, the case was "still in litigation."

Our own review of defendants' belated offer of proof, which the trial court refused to consider, discloses that their impeachment evidence would have been inadmissible or of limited significance given the evidence that was already before the jury. The attached police and toxicology reports were hearsay that could not have been admitted through Kent's testimony. Those reports also did not include salient information that was not otherwise provided to the jury through witness and expert testimony. The deposition excerpts mostly related to defendants' theory that Todd exacerbated the effect of the phone call on Wade, but defendants have made no prejudice

---

[9]   Because the issue has not been raised on appeal, we express no view as to the proper interpretation of the trust documents.

34

argument regarding that theory on appeal. It is telling defendants themselves do not rely on the offer of proof to argue that they suffered prejudice. While they argue that no proffer was necessary to preserve the issue on appeal, they do not explain how the specific documents in the offer of proof help meet their burden of showing it was reasonably probable they would have received a more favorable result at trial. (See *Mountain View, supra*, 106 Cal.App.5th at p. 506.)

Considering all this, we cannot conclude that the prohibited cross-examination would have produced a significantly different impression of Todd's credibility or the salient disputed facts in the case. Accordingly, we find no reversible error in the trial court's decision to curtail the defense's cross-examination of Todd.

### III

Lastly, we consider defendants' arguments that substantial evidence does not support the jury's damages awards. We reject these arguments as well.

A. *Additional Background*

Along with his pretrial in limine motions, Kent submitted an "objection to the introduction of *any evidence* in support of Plaintiff's complaint" under Code of Civil Procedure section 430.10 on the ground that the trust petitions were "currently under the jurisdiction of the probate department where they belong." (Underlining omitted and italics added.) In support, Kent requested that the court take judicial notice of (1) an August 2020 probate court order regarding the distribution of Leonard's trust and a September 2022 appellate decision affirming that order; and (2) "the existence" of litigation in Gale's trust. The trial court denied Kent's "objection" as an improper dispositive

35

motion but took judicial notice of the probate court documents for the purpose of ruling on it.

In another motion in limine, Kent initially sought to exclude from trial all evidence related to the probate litigation over his parents' trusts. He argued such evidence was irrelevant and "a waste of time." The court denied the motion without prejudice. Mid-trial, however, Kent requested that the court take judicial notice of certain probate court documents.[10] The court denied the request. Accordingly, these documents were never presented to the jury and cannot be considered in assessing a claim of insufficient evidence to support the damages awards. (See *Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 828 (*Frank*) [exhibits "not admitted during the jury trial . . . may not be considered in determining the sufficiency of the evidence to support the jury's verdict"].)

On appeal, defendants have not challenged the trial court's ruling denying this request for judicial notice. Instead, they have filed a separate request in this court for judicial notice of five documents from the probate litigation, including an October 2023 probate court order directing a preliminary distribution of $50,000 each to the four beneficiaries of Leonard's trust. Defendants argue that these documents are relevant to their sufficiency argument on the damages awards. But none of these documents were introduced or admitted at trial and the jury heard no testimony about them. Accordingly, we may not consider these documents in deciding the sufficiency issue either. (See *Frank, supra*, 149 Cal.App.4th at p. 828.) We deny the request for judicial notice because these documents were not

---

[10]  The appellate record does not include this request for judicial notice or the attached documents, so we do not know which probate court documents were the subject of the request.

admitted into evidence at trial and are therefore irrelevant to the sufficiency issue raised by defendants on appeal.

### B. *$1 Million Award for Lost Inheritance from Leonard's Trust*

Defendants are challenging two categories of lost inheritance damages: the $1 million award to Wade's estate for the lost inheritance from Leonard's trust and the $4 million award to Wade's estate for the lost inheritance from Gale's trust. As to Leonard's trust, defendants argue that because the probate court ruled the estate would be divided among all four brothers, and we affirmed that ruling on appeal after Wade had died, plaintiffs should have been precluded from "proceed[ing] on a theory of damages that was wholly inconsistent with the final rulings of the probate court." Specifically, defendants contend that the doctrine of collateral estoppel or issue preclusion requires reversal of the $1 million award for Leonard's trust.

We conclude that defendants forfeited this issue by failing to raise it properly in the trial court. Kent referred to "res judicata" only in passing in his pretrial "objection to the introduction of *any evidence* in support of Plaintiff's complaint" under Code of Civil Procedure section 430.10. (Underlining omitted and italics added.) In that filing, Kent focused primarily on the rule of exclusive concurrent jurisdiction. He did not discuss the elements of res judicata or collateral estoppel, and did not explain how either of those doctrines applied to the ongoing probate proceedings. He also did not seek to preclude recovery of any specific category of damages. On the contrary, the only relief he sought was that the "court should enter an interlocutory judgment in favor of defendants on any cause of action arising out of [Leonard]'s trust petition" and "an order staying all other issues in this case until [Gale]'s pending trust petition has been fully adjudicated." Moreover, defendants did not assert issue preclusion as one of the grounds for

37

challenging the damages awards in their post-trial motions for new trial or JNOV. At no point in the proceedings below did defendants assert that the doctrine of issue preclusion barred recovery of damages for lost inheritance from Leonard's estate.

In these circumstances, defendants have forfeited their issue preclusion claim relating to the $1 million award for lost inheritance from Leonard's estate. (See *People v. Harden* (2022) 81 Cal.App.5th 45, 52 [failure to raise issue preclusion in trial court forfeits contention on appeal]; *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 332 [plaintiffs forfeited issue preclusion defense where, although they "made references" to it, they "did not identify the elements" of issue preclusion and did not "attempt to apply the facts of the case to those elements"]; *Fireside Bank Cases* (2010) 187 Cal.App.4th 1120, 1127 [defendant who "simply asserted" the plaintiff's "claims were barred by res judicata and collateral estoppel, without troubling to establish or even acknowledge the conditions for operation of those doctrines," could not rely on preclusive effect of prior judgments].)

Setting aside the forfeited claim of issue preclusion, defendant's sufficiency argument as to the lost inheritance from Leonard's trust is premised entirely on probate documents that were not part of the evidence admitted at trial or considered by the jury. Defendants make no sufficiency argument independent of these documents. We cannot find insufficient evidence to support the jury's damages award based on facts or evidence not presented to the jury.

### C. *$4 Million Award for Lost Inheritance from Gale's Trust*

Defendants also contend that the $4 million awarded to Wade's estate for the lost inheritance from Gale's trust is not supported by substantial

evidence. Specifically, they assert that "the amount Wade would have received if he had survived distribution of Gale's trust is entirely speculative" because Kent in the probate court has challenged the amendment disinheriting defendants as being "procured through undue influence." According to defendants, Gale's trust was mired in litigation and Wade's estate would be entitled to $2 million at most if the disinheritance amendment was found to be invalid.

We are not persuaded. Defendants presented no evidence or argument to the jury that they were challenging their disinheritance in the ongoing probate proceedings. They cite no such evidence in their briefs. The jury heard only limited testimony about the fact that there was pending probate litigation, and the orders and briefs from those proceedings were not admitted into evidence. Like the sufficiency argument relating to Leonard's estate, the premise of this sufficiency argument is based on facts not presented to the jury. Again, we cannot reverse a damages award for insufficient evidence based on a theory that is itself not supported by any evidence presented to the jury.

The jury did, however, see trust documents and hear testimony supporting Todd's theory that Wade would have received a $4 million inheritance from Gale's trust if he had survived the asset distribution. As noted, defendants do not challenge on appeal that Gale's trust has language suggesting that its beneficiaries must survive the distribution of assets. The trust document itself was admitted into evidence at trial, and defendants did not contest this interpretation of its language either at trial or in this appeal. And while defendants have raised arguments about what portion of Gale's trust Wade's estate is entitled to, they do not dispute that the total value of Gale's estate is approximately $8 million, an amount the jury used to award

damages. Viewing this evidence in the light most favorable to the judgment, and confining our review to the evidence actually admitted at trial, we conclude that substantial evidence supports the jury's award of $4 million to Wade's estate.[11] (See *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632–1633.)

D. *$3.8 Million Award to Todd for Loss of Love and Companionship*

Finally, defendants challenge the $3.8 million award to Todd as compensation for the loss of Wade's love and companionship. They do not contend this award is excessive but argue it should be offset by the "financial windfall" Todd will receive from Wade's passing because Todd will inherit greater portions of his parents' estates.

We conclude this argument is forfeited because it was not raised in the trial court. Defendants did not request any jury instruction on this offset theory and did not argue it to the jury. In a civil case, each party must request complete and comprehensive jury instructions on its theory of the case. (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 675.) An appellant may not challenge the sufficiency of evidence based on a new theory on which it did not request jury instructions (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1065–1066) and which it did not argue to the jury (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 877–879).

---

[11]    In his briefing on appeal, Todd disclaims any intent to obtain a double recovery of Wade's inheritances in this case and again in the probate proceedings. He asserts that if the judgment in this case is affirmed, "the probate court has numerous tools at its disposal to take appropriate action to ensure that those awards are credited or offset consistent with its orders of final distribution for those trusts." We are similarly confident that the probate court has the ability to take appropriate action to prevent or correct any double recovery.

Moreover, neither of defendants' post-trial motions even mentioned the idea of a windfall or offset, but rather focused only on how the jury awards were "speculative in nature."  Because defendants failed to raise their windfall argument in the trial court, they have forfeited their challenge on appeal.  (*JJD-HOV Elk Grove LLC v. Jo-Ann Stores, LLC* (2024) 17 Cal.5th 256, 270.)

## DISPOSITION

The judgment and the order denying defendants' motion for JNOV are affirmed.  Plaintiffs shall recover their costs on appeal.


BUCHANAN, J.

WE CONCUR:


DO, Acting P. J.


CASTILLO, J.